**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**RONALD H. SCHOCKER,**

       **Plaintiff,**

**vs**                               **Case No: 07-15059**
                                       **HONORABLE VICTORIA A. ROBERTS**

**GUARDIAN ALARM CO. OF MICH.,**

       **Defendant.**
_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

Before the Court is Defendant's Motion for Summary Judgment. The Court

heard oral argument on July 28, 2008. For the following reasons, the Court **GRANTS**

**the Motion in part and DENIES it in part**.

**II.    BACKGROUND**

On April 3, 1987, Ronald H. Schocker ("Plaintiff") completed an employment

application for Guardian Alarm Co. of Mich. ("Guardian"). The application asked:

> Have you ever been convicted in this country for violation of other than the
> motor vehicle code?

Plaintiff answered: "No." Def.'s Mot. at 6 (citing Ex. A (incorrectly filed as Ex. B.)).

The final page of the application contained an ""Authorization and

Understanding:"

> Upon the signing of this application, I represent that all of the information now

1

or hereafter given by me in support of my application for employment is true and complete. . . .  I agree that any false information in support of my application may subject me to discharge at any time during the period of my employment.

*Id.*

In support of his application, Plaintiff submitted fingerprints and authorized the State Police to release criminal information about him to Guardian.

Actually, Plaintiff had been convicted of Breaking and Entering of a Building with Intent to Commit Larceny in violation of M.C.L. § 750.110.

Guardian conditionally hired Plaintiff in April of 1987.  During August 1987, Plaintiff says he was summoned to a meeting with Guardian's Customer Service Manager, Bill Lozon, and General Manager, Paul Parr.  At this meeting, Plaintiff received a copy of a letter from the Michigan State Police addressed to Guardian's owner, Milton Pierce.  The letter notified Pierce of Plaintiff's conviction and instructed Pierce to terminate his employment:

> Dear Mr. Pierce,
>
> The employment of RONALD HYGEN SCHOCKER, DOB: 3/11/64, who was fingerprinted to work for your burglar alarm contracting agency must be terminated under the provisions of Section 18 of Act 330, P.A. of 1968, as amended.
>
> Enclosed, please find a copy of the convictional criminal history information for the above listed individual.  Please return the enclosed "Notification of Termination Statement", dated and signed upon termination of the above named employee. . . .

Pl.'s Ex. 3, Department of State Police Letter, August 14, 2007.

Plaintiff explained the circumstances of his conviction to Lozon and Parr, and was not terminated.  According to Plaintiff, the conviction resulted from a dispute with an

apartment complex, from which Plaintiff removed a handrail from a vacant apartment for use in his apartment.  Plaintiff says he was arrested after he called the apartment manager to tell her what he had done and apologize.  Parr advised Plaintiff he should try to get the conviction expunged.

Plaintiff remained employed by Guardian for twenty years.  Despite no mention of this critical point in its Motion or Reply, Defendant maintained at oral argument that it did not become aware of this conviction until it received the Michigan State Police letter from Plaintiff through discovery.

Plaintiff's responsibilities at Guardian included the sale of security monitoring services to customers, as well as the sale and lease of a small amount of complementary equipment related to the monitoring services.  To the best of Plaintiff's knowledge, with the exception of his August 1987 meeting, nobody at Guardian ever questioned him about his conviction.

In August and December of 2005, and May of 2006, Elena McCreary and/or Angela Long, female employees at Guardian, complained to Plaintiff about sexual advances by Jeff Prough, Guardian's President, and/or Matthew Fraiberg, Guardian's Vice-President.  Plaintiff took no action until after the third complaint in May 2006, when McCreary submitted her resignation to Plaintiff citing sexual harassment by Fraiberg. After receiving the resignation, Plaintiff called Guardian's in-house attorney Bob Craig. A few days later, Plaintiff informed Fraiberg of the complaints.  During the conversation Plaintiff said that Fraiberg should be more careful about his conduct and how it was perceived by others.  Fraiberg responded that he had only been joking around, and thanked Plaintiff for informing him of the complaints.

Elena McCreary left her employment with Guardian in October of 2006. The same day, Plaintiff was called into a meeting with Todd Thomas, one of Plaintiff's two supervisors, and Fraiberg. Fraiberg blamed Plaintiff for McCreary's resignation, and told him she had reported that she resigned because Plaintiff was a bad manager. Contrary to this characterization, Plaintiff says that when he asked Human Resources Director, Gisela Foreman (who conducted McCreary's exit interview and subsequently walked into the meeting between the three men), why McCreary resigned, she responded that McCreary reported resigning because of something Fraiberg did. Plaintiff also independently asserted that McCreary left because of Fraiberg's conduct. He says that following his October 2006 meeting with Fraiberg and Thomas his performance evaluations were lowered, his past earned commissions were not paid, his compensation plan reduced, and his responsibilities reduced.

In December of 2006, Plaintiff was presented with a compensation plan that would significantly reduce his income, retroactive to July 1st 2006. Plaintiff refused to sign this compensation plan. However, on January 25, 2007, Plaintiff signed the salary packet for 2007. The same day he signed an "employee payroll changes notice," which stated:

> All commissions for 2006 are paid and collected in full. Start draw account 1/1/07 with a clean slate.

Def.'s Ex. E. Four days later, Plaintiff signed an "addendum:"

> Notwithstanding anything to the contrary contained herein or in any other standard, compensation plan, agreement or promise, EMPLOYEE agrees that except as set forth in this compensation plan/standard dated 1/1/07, no other compensation is owed to EMPLOYEE.

Def.'s Ex. F.

Although he signed the addendum, Plaintiff wrote the words "previously earned" between "other" and "compensation," so the version he signed read:

> Notwithstanding anything to the contrary contained herein or in any other *previously earned* standard, compensation plan, agreement or promise, EMPLOYEE agrees that except as set forth in this compensation plan/standard dated 1/1/07, no other compensation is owed to EMPLOYEE.

*Id.* (emphasis added).

In February of 2007, one of the employees Plaintiff supervised was promoted to take over the commercial portion of Plaintiff's job. In March of 2007, Plaintiff agreed to meet with Prough (no longer working at Guardian), and Ira Berkowitz (one of Prough's best friends). Def.'s Ex. C at 1133. At this time, Guardian was engaged in several lawsuits against many of its former top managers (including Prough) who had left to form their own security company. Berkowitz later joined the breakaway company.

Plaintiff met Prough and Berkowitz at an Applebee's Restaurant. While Plaintiff waited, Fraiberg, dining with his family, noticed Plaintiff and asked who he was meeting with. Plaintiff responded an "old friend," went to the bathroom, and left the restaurant. Later, Plaintiff admitted he was at the restaurant to meet Berkowitz, but refused to disclose the subject matter of the meeting. Plaintiff received a lower performance evaluation from Thomas during this month.

On April 3, 2007, Plaintiff filed a charge of retaliation with the Equal Employment Opportunity Commission ("EEOC"), and the Michigan Department of Civil Rights ("MDCR"). The charge alleges retaliation against Plaintiff for reporting the complaints of harassment to Fraiberg.

On April 17, 2007, Plaintiff informed Karen Majeske, his second supervisor, of his

EEOC charge. Foreman received a copy of the charge the next day and discussed it with Craig. That same day, Thomas told Plaintiff that he was not to see customers and should stay in the building working in-house.

On April 19, 2007, Foreman and Thomas told Plaintiff he was fired. Plaintiff was told the company had decided to go in another direction.

According to Guardian, Fraiberg terminated Plaintiff's employment in part because he had lost confidence in Plaintiff after seeing him at Applebee's waiting to meet with Berkowitz, and because of the "ever increasing number of complaints that [Fraiberg] had been receiving from subordinate employees regarding [Plaintiff's] performance (rude comments and behavior, inappropriate dress, inability to provide support to subordinate sales employees and attendance) . . . ." Def.'s Mot. at 9

Plaintiff says he was fired as a direct result of his EEOC retaliation charge. He points to Thomas' deposition:

> Q. Did Mr. Fraiberg ever express to you that he was going to take any action involving Mr. Schocker's employment as a result of that EEOC charge?
>
> A. Yes.
>
> Q. What did he say?
>
> A. That he was going to be terminated.
>
> Q. Did you discuss with Mr. Fraiberg whether he was going to tell Mr. Schocker that he was being terminated because of the EEOC charge?
>
> A. Yes.
>
> Q. Okay. And what took place in that discussion?
>
> A. That he was going to be let go for nonperformance.
>
> Q. Was it clear to you from your discussion with Mr. Fraiberg, though, that his intent was to terminate Mr. Schocker because of the EEOC

charge?

A.     Yes.

Pl.'s Ex. 8 at 11.

Plaintiff alleges retaliation under Title VII and the Michigan Elliot-Larsen Civil Rights Act ("ELCRA"), violation of the Michigan Sales Representative Commissions Act ("MSRCA"), breach of contract, and promissory estoppel.

## III.     STANDARD OF REVIEW

This Court grants summary judgment to the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995); FED. R. CIV. P. 56(C).  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The judge is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

## IV.     ANALYSIS

## 1.     Generally

Resolution of this Motion has been made more difficult because of Guardian's shifting and contradictory arguments.  In its briefs, Guardian takes two incompatible positions: (1) Plaintiff's criminal conviction is after acquired evidence, which limits his

remedies; and (2) Plaintiff's criminal conviction is the legitimate non-discriminatory reason for terminating Plaintiff's employment. These theories are mutually exclusive. By definition, after acquired evidence must be acquired during discovery. In turn, by definition, a legitimate non-discriminatory reason for the materially adverse action must be known before the action is taken. *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 359-360 (1995)

Second, review of its briefs reveals that Guardian initially relied only on Defendant's criminal conviction to meet its burden of production on Plaintiff's claim for retaliatory termination. Indeed, the briefs do not specifically meet Guardian's burden of production on the non-termination retaliation claims for changes to Plaintiff's evaluations, pay, responsibilities, and benefits. Although Guardian's statement of facts mentions Fraiberg's representation that Plaintiff was fired in part because of deficient performance, the section titled "Legitimate NonDiscriminatory Reason For Termination" only mentions Plaintiff's criminal conviction. Def.'s Mot at 12-13.

However, Guardian reversed course at oral argument. Casting aside its initial legitimate non-discriminatory conviction related rationale, Guardian now maintains it meets it burden of production on the termination claim, and by implication the non-termination claim, solely on account of Plaintiff's deficient job performance.

Before addressing Guardian's Motion, the Court notes that these shifting rationales to satisfy its burden of production are incompatible with the *McDonnell-Douglas* burden shifting framework. Plaintiff cannot effectively respond to a legitimate non-discriminatory explanation that is in flux at Guardian's convenience.

**2.    Title VII**

**A.    The After Acquired Evidence Doctrine Does Not Apply or its Application is a Contested Material Fact**

Guardian argues the after-acquired evidence doctrine precludes Plaintiff's claim for retaliation under Title VII.  However, the after-acquired evidence rule pertains to the scope of damages available to Plaintiff, not whether Guardian is liable under the statute. *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1168 (6th Cir. 1996) ("As a general rule, under the after-acquired evidence doctrine the employee is barred from obtaining front pay and reinstatement, and backpay is limited."); *Warner v. Pipeline Dev. Co.*, No. 06-2719, 2008 U.S. Dist. LEXIS 27720, at *41 (N.D. Ohio Apr. 2, 2008) ("[T]he doctrine acts in equity to limit a plaintiff's remedies, not in law to absolve a defendant of liability.").

More importantly, the after acquired evidence rule is, rather sensibly, limited to after-acquired evidence.  Where evidence is known before discharge the doctrine does not apply.  *See McKennon*, 513 U.S. at 362 ("The beginning point in the trial court's formulation of a remedy should be calculation of backpay *from the date of the unlawful discharge to the date the new information was discovered.*") (emphasis added); *Blackwell v. Prod. Action Int'l, Inc.*, No. 04- 231, 2006 U.S. Dist. LEXIS 92027, at *51-52 (E.D. Ky. Dec. 18, 2006) ("The 'after-acquired evidence' doctrine bars obtaining front pay and reinstatement and back pay is limited when the employer learns of prior misconduct *through discovery.*") (emphasis added).

Despite failing to directly contest the point in its Reply, at oral argument, Guardian disputed Plaintiff's assertion that it became aware of Plaintiff's prior felony conviction shortly after hiring him or that it was instructed by the state police to

terminate his employment over twenty years ago.  However, Guardian's position at oral argument does not change the result of its Motion for Summary Judgement.  Viewing the evidence in the light most favorable to Plaintiff, Guardian was aware of his conviction a few months after hiring him, and this question is, at the very least, a contested material fact.

Even if the Court had authority to contort the "after-acquired evidence doctrine" to apply to evidence acquired before discharge, the doctrine is also inapplicable because Guardian cannot establish as a matter of law that Plaintiff's criminal conviction was wrongdoing of "such severity that the employee in fact would have been terminated," when it was aware of this information within five months of his conditional employment, and maintained his employ for twenty years thereafter.  *McKennon*, 513 U.S. at 362-363; *Yellow Freight Sys.*, 90 F.3d at 1168.  Guardian may reasonably argue that it would not have *originally* hired Plaintiff, as distinguished from whether it would have terminated him after learning of the conviction after hiring him conditionally.  Despite the language of the Supreme Court that the question the court must answer is whether "the wrongdoing was of such severity that the employee in fact *would have been terminated* on those grounds alone if the employer had known of it at the time of the discharge," the Sixth Circuit appears to have broadened the holding to include a "would not have hired" argument.  *McKennon*, 513 U.S. at 362-363.  Under this construction, application of the rule includes instances where there was an established policy of not *hiring people* with the characteristic at issue.  *See Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1168 (6th Cir. 1996) (holding that "[b]ecause [defendant] failed to prove it could have and would have refused to hire [plantiff], the after-acquired evidence defense did not

apply."); *Maiden v. APA Transp. Corp.*, No. 00-883, 2002 U.S. Dist. LEXIS 8076, at *32-33 (S.D. Ohio May 3, 2002) (holding a defendant must meet its burden to demonstrate it *actually* would not have hired the plaintiff and determining this was a credibility issue for the jury).

Guardian points to the fact that it was illegal to hire Plaintiff at the time as evidence that it would not have hired him. However, in light of Guardian's willingness to keep him on after being informed of his conviction five months into his employment, whether they actually would not have hired him is a contested fact, especially where Guardian does not offer any evidence it would have "fired or not hired the applicant as a routine matter or that the policy is firmly settled." *Maiden*, 2002 U.S. Dist. LEXIS 8076, at *36.

Guardian might establish at trial that it never received the letter addressed to it by the state police. If it convinces the trier of fact that it became aware of the information during discovery, the doctrine will apply.

**B.     Illegal Employment Contract & Relationship to Title VII**

At oral argument, Guardian appeared to argue that the protections of Title VII will not apply if the underlying employment contract is found to be in violation of Michigan law. Guardian's position is untenable for several reasons.

First, Guardian's argument is incompatible with the statutory purpose and goals of Title VII. Because the primary purpose of Title VII is remedial, its provisions are given a liberal construction. *See Armbruster v. Quinn*, 711 F.2d 1332, 1336 (6th Cir. 1983) (citing *Tipler v. E.I. duPont de Nemours & Co.*, 443 F.2d 125, 131 (6th Cir.

11

1971)), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006);

*Tiller v. Immke Auto. Group, Inc.*, No. 05-1034, 2007 U.S. Dist. LEXIS 31136, at *15

(S.D. Ohio Apr. 27, 2007).  To allow Guardian to avoid liability where, viewing the facts

in the light most favorable to Plaintiff, it knowingly kept an employee in violation of a

Michigan statute for twenty years, and then points to this violation to avoid liability for

illegal discrimination in the form of retaliation, is contrary to the goals of Title VII.  As

explained by *McKennon*:

> The ADEA and Title VII share common substantive features and also a common purpose: "the elimination of discrimination in the workplace." Congress designed the remedial measures in these statutes to serve as a "spur or catalyst" to cause employers "to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges" of discrimination.  Deterrence is one object of these statutes. Compensation for injuries caused by the prohibited discrimination is another.  The ADEA, in keeping with these purposes, contains a vital element found in both Title VII and the Fair Labor Standards Act: It grants an injured employee a right of action to obtain the authorized relief.  The private litigant who seeks redress for his or her injuries vindicates both the deterrence and the compensation objectives of the ADEA. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 45, 39 L. Ed. 2d 147, 94 S. Ct. 1011 (1974) ("The private litigant [in Title VII] not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices").  It would not accord with this scheme if afteracquired [sic] evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the Act.
>
> The objectives of the ADEA are furthered when even a single employee establishes that an employer has discriminated against him or her. The disclosure through litigation of incidents or practices which violate national policies respecting nondiscrimination in the work force is itself important, for the occurrence of violations may disclose patterns of noncompliance resulting from a misappreciation of the Act's operation or entrenched resistance to its commands, either of which can be of industry-wide significance. The efficacy of its enforcement mechanisms becomes one measure of the success of the Act.

*McKennon*, 513 U.S. at 358-359 (internal citations omitted).

Second, the specifics of the contractual relationship between Plaintiff and Guardian are not the basis for *liability* under the retaliation provisions of 28 U.S.C. § 2000e-3. *McKennon* implicitly recognized this distinction when it overturned the Sixth Circuit, and several other circuit's application of the after-acquired evidence doctrine to *preclude liability*. *See* Jenny B. Wahl, *Protecting the Wolf in Sheep's Clothing: Perverse Consequences of the McKennon Rule*, 32 Akron L. Rev. 577, 635-636, 652-653 (1999).

Third, the protections and obligations of the act extend to "employees" and "employers" as defined in the act, which has been interpreted to extend further than the traditional employer-employee relationship. *See Weary v. Cochran*, 377 F.3d 522, 524-525 (6th Cir. 2004) ("We have recently clarified that the proper test to apply in determining whether a hired party is an employee or an independent contractor . . . is the 'common law agency test' set forth in *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318, 322 (1992)); *Satterfield v. Tennesse*, 295 F.3d 611, 617 (6th Cir. 2002) (citing *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 319 (6th Cir. 2001)) ("[F]or the purposes of the ADA and other Civil Rights Acts, an employer/employee relationship is identified by considering: 'the entire relationship, with the most important factor being the employer's ability to control job performance and employment opportunities of the aggrieved individual.'"); *Lantz v. United States Postal Serv.*, No. 05-207, 2006 U.S. Dist. LEXIS 72569, at *6-7 (W.D. Mich. Oct. 5, 2006) ("The common law agency test is used to determine whether an individual is an employee or an independent contractor.").

Under the common law agency test, or for that matter any of the tests described in *Satterfield*, Plaintiff was an "employee" and Guardian an "employer" as defined under

the act.  Regardless of any shortcomings of the employment contract under Michigan law, Title VII's provisions apply.  There is no basis to reach a contrary conclusion on Plaintiff's ELCRA claim; ELCRA parallels Title VII in its goals, language, and purpose.  Indeed, the Supreme Court of Michigan's adoption of *McKennon*, underscores the parallel rationales undergirding the distinction between the employment contract and the protections of civil rights statutes.

Guardian's argument that the employment contract's violation of Michigan law would preclude liability under Title VII or ELCRA, is without merit.

**C.      Burden Shifting Analysis**

**1.      Generally**

Plaintiff may satisfy his burden through either direct or circumstantial evidence. *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 543-544 (6th Cir. 2008); *Abbott v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir. 2002).  "Direct evidence is that evidence which, if believed, *requires* the conclusion that unlawful retaliation was a motivating factor in the employer's action" and "proves the existence of a fact *without any inferences or presumptions*."  *Abbott*, 348 F.3d at 542 (second emphasis added).  The difference between direct evidence and circumstantial evidence is that direct evidence requires "the conclusion that defendant unlawfully retaliated against plaintiff" while circumstantial evidence would *allow* the conclusion of retaliation "only by making a series of inferences arising from plaintiff's evidence."  *Id.* at 542 (emphasis added).   If Plaintiff is unable to establish retaliation by direct evidence, he must establish a prima

facie case of retaliation and meet the additional burden shifting requirements of the *McDonnell-Douglas* framework. *Id.*; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973).

**2.     Direct Evidence**

Plaintiff points to the deposition testimony of Thomas as direct evidence of retaliation, *supra*.

This testimony does not *require* the conclusion that Fraiberg retaliated against Plaintiff. The testimony states Thomas' personal understanding of the true meaning of Fraiberg's statement to him, not that Fraiberg actually said Plaintiff's termination was because of his EEOC complaint. This testimony expressed Thomas' own inference, drawn from Fraiberg's statement, and in turn, requires an inference to conclude Fraiberg's statement had an implicit retaliatory meaning. Plaintiff fails to provide direct evidence and must prove his case through circumstantial evidence under the *McDonnell-Douglas* framework. *Abbott*, 348 F.3d at 542.

**3.     Circumstantial Evidence**

**A.     McDonnell-Douglas Burden Shifting**

The prima facie elements of a Title VII retaliation claim are:

(1) plaintiff engaged in activity protected by Title VII;

(2) this exercise of protected rights was known to the defendant;

(3) the defendant thereafter took a materially adverse action against the plaintiff or subjected the plaintiff to severe and pervasive retaliatory harassment; and

(4) there was a causal connection between the protected activity and the materially adverse action.

*Evans v. Prospect Airport Servs.*, No. 07-5303, 2008 U.S. App. LEXIS 13914, at *15-16 (6th Cir. June 27, 2008) (unpublished); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-596 (6th Cir. 2007); *Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006) (establishing new standard for the third element of retaliation claims).

If a prima facie case of retaliation is made using circumstantial evidence the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the materially adverse action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997). If the defendant meets its burden of production, the "plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. To succeed, Plaintiff must demonstrate, by a preponderance of evidence, that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Dews*, 231 F.3d at 1021 (citing *Manzer*, 29 F.3d at 1084.

i. **Participation and Opposition Clauses**

Guardian first contends Plaintiff did not engage in protected activity under Title VII, and therefore, fails to establish the first element of a prima facie case.

Title VII prohibits an employer from discriminating against any employee "because he has opposed any practice made an unlawful practice by [Title VII], or

16

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" 42 U.S.C. § 2000e-3(a)). Thus, Title VII's protection from retaliation falls under either the participation or opposition clauses. "'The distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings.'" *Niswander v. Cincinnati Ins. Co.*, No. 07-3738, 2008 U.S. App. LEXIS 13284, at *13 (6th Cir. June 24, 2008) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989)). Although neither party clearly differentiates between these two clauses in briefs, different aspects of Plaintiff's claim fall under different clauses.

### ii.    Participation Clause

With respect to the participation clause, the Sixth Circuit recognized the clause's "exceptionally broad protections . . . extend . . . to persons who have participated in any manner in Title VII proceedings." *Niswander*, 2008 U.S. App. LEXIS 13284, at *13 (quoting *Johnson*, 215 F.3d at 582) (citation and internal quotation marks omitted)). "[O]nce the activity in question is found to be within the scope of the participation clause, the employee is generally protected from retaliation." *Id.* at *13 (quoting *Brown & Williamson Tobacco Co.*, 879 F.2d at 1312). Filing an EEOC charge is firmly within the scope of the participation clause. *Abbott*, 348 F.3d at 542-543; *Brown & Williamson Tobacco Co.*, 879 F.2d at 1313; *Crawford v. Metro. Gov't of Nashville & Davidson County*, 211 F. App'x. 373, 376 (6th Cir. 2006) (unpublished) *cert. granted*, 128 S. Ct.

1118 (2008).

Guardian next challenges the fourth element of a prima facie case, alleging that Plaintiff cannot establish a causal connection between the protected activity and the materially adverse action. The Sixth Circuit frequently cautioned against inferring a causal connection based solely on the proximity of the protected conduct and the materially adverse action. *See e.g. Hall v. Eastman Chem. Co.*, 136 F. App'x 730, 733 (6th Cir. 2005) (unpublished) ("[W]e have held that temporal proximity alone is insufficient to establish causation; the plaintiff must also bring forth other evidence of causation."); *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-364 (6th Cir. 2001) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)) ("[T]emporal proximity alone is insufficient to establish a causal connection for a retaliation claim."); *see also Thompson v. E.I DuPont deNemours & Co.*, 140 F. Supp. 2d 764, 786 (E.D. Mich. 2001); *Joiner v. Ohio Dep't of Transp.*, 949 F. Supp. 562, 569 (S.D. Ohio 1996).

Nonetheless, the Sixth Circuit recently clarified that its previous holdings did not prohibit a high level of temporal proximity from supporting a causal connection. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524 (6th Cir. 2008) ("Although *Nguyen* did however note that other earlier cases could be read as having 'rejected the proposition that temporal proximity is enough,' *Nguyen* reads these cases expansively, and none squarely stands for the proposition that temporal proximity alone may never show a causal connection.") (internal citation omitted) (applying Title VII federal precedent to ELCRA claim); *Evans*, 2008 U.S. App. LEXIS 13914, at *17-18 (applying *Mickey* to Title VII retaliation).

The most recent teaching from the Sixth Circuit is this:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, *such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.* But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey*, 516 F.3d at 525 (emphasis added). The Sixth Circuit explained the underlying rationale for this approach:

> [I]f an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action.

*Id.* The Sixth Circuit concluded that the plaintiff established a causal connection when he was fired the same day the defendant received notice of the EEOC charge.

Based on *Mickey*, the Court holds Plaintiff establishes a causal connection when he was terminated the day after Guardian's receipt of the EEOC charge. This temporal proximity is underscored by the fact that Plaintiff was restricted to in-house duties later *the same day* Guardian received the EEOC charge.

The temporal proximity of Guardian's notice of the EEOC charge to Plaintiff's restriction to in-house duties and his termination, meets Plaintiff's burden to establish a prima facie case. *See Mickey*, 516 F.3d at 525; *Moore v. KUKA Welding Sys.*, 171 F.3d

1073, 1080 (6th Cir. 1999); *Walton v. NOVA Info. Sys.*, No. 06-292, 2008 U.S. Dist. LEXIS 29944, at *37-38 (E.D. Tenn. Apr. 11, 2008).

Guardian cites the following performance deficiencies to support the legitimate non-discriminatory explanation of job performance:

> (1) Plaintiff's sales and retention numbers were lower in the months leading up to his termination;
>
> (2) Plaintiff's sales employees were complaining about having to work for him and about his support as a manager;
>
> (3) Plaintiff engaged in unprofessional conduct and had an unprofessional demeanor at work; and
>
> (4) Plaintiff was spending some of his work day attending to his rental properties.

Because Guardian meets its burden of production, Plaintiff must "demonstrate pretext [by a preponderance of evidence] by showing that the proffered reason: (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000) (citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). He argues the professed legitimate non-discriminatory reason did not actually motivate his termination.

When making the second showing:

> [T]he plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that *the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's*

*explanation is a pretext, or coverup.*

*Manzer*, 29 F.3d at 1084 (emphasis added).  This burden has been characterized as requiring the strength of the circumstantial evidence of retaliation overwhelm, or at least permit a reasonable juror to conclude that it overwhelms the non-discriminatory reason or reasons.  *Id.*

Plaintiff need not "produce additional evidence to support a finding of pretext; the evidence that he produced in support of his prima facie case may, but will not necessarily, suffice to show a genuine issue of material fact concerning pretext and thus to survive summary judgment."  *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 533 (6th Cir. 2007).  Instead, plaintiff  "need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale."  *Id.* at 532.  In evaluating this burden, "[t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination."  *Id.* at 532.

In addition to the proximity between Guardian's knowledge of the EEOC charge and Plaintiff's termination, Plaintiff also points to Thomas' testimony that Fraiberg implicitly communicated he was firing Plaintiff because of the EEOC charge.  The passage of one day between Guardian's notice of the charge, coupled with this strong circumstantial evidence, successfully rebuts Guardian's proffered rationale and can give rise to an inference of unlawful discrimination.  *Id.*  A reasonable jury could find that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than

not' that the employer's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084.

Plaintiff's retaliation claim under Title VII's participation clause will continue to trial.

### iii.    Opposition Clause

The opposition clause covers conduct such as "'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer--e.g., former employers, union, and co-workers.'" *Niswander*, 2008 U.S. App. LEXIS 13284, at *13-14 (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000)); *see also Brown & Williamson Tobacco Co.*, 879 F.2d at 1313.  Plaintiff alleges he was retaliated against for informing Fraiberg about the allegations against him, and telling him to be more careful to not give the impression of harassment in the future.

Citing *Brown & Williamson Tobacco Co., Inc.*, 879 F.2d at 1313, Guardian states that "vague internal charges of harassment do not constitute protected activity."  Def.'s Mot. at 12.  In *Booker*, the Sixth Circuit held that "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice" under Title VII*. Brown & Williamson Tobacco Co.*, 879 F.2d at 1313.  However, Plaintiff's opposition was not vague.  He referenced specific allegations of sexual harassment, expressed, at least, some disapproval of the conduct, and encouraged Fraiberg to change his behavior.  This conduct constituted opposition to sex discrimination, and "the manner of [Plaintiff's] opposition [was] reasonable."

*Niswander*, 2008 U.S. App. LEXIS 13284, at *13-14.  Plaintiff satisfies the first element of his prima face case for his opposition based claim.

Guardian challenges the fourth element of a prima facie case, alleging that Plaintiff cannot establish a causal connection between the protected activity and the materially adverse action(s).

Plaintiff's claim that there is a causal connection between his opposition to the alleged sexual harassment and materially adverse actions is a closer question.  Plaintiff engaged in protected opposition to the alleged harassment in May 2006 when he went spoke to Fraiberg about the allegations of sexual harassment.  Plaintiff says that following his October 2006 meeting with Fraiberg, where Fraiberg blamed him for McCreary's departure the following occurred:

(1) The reduction of his compensation plan in late January 2007;
(2) The February 2007 promotion of the employees Plaintiff supervised to take over the commercial portion of his job; and
(3) The receipt of a downgraded evaluation in February 2007.

Approximately seven months passed between Plaintiff's protected opposition and the materially adverse action related to his compensation.  Standing alone this temporal proximity is likely insufficient as a matter of law to established a causal connection.

However, the following additional circumstantial evidence could support a causal relationship between Plaintiff's opposition to sexual harassment and the reduction of his compensation:

(1) The subject matter of the October 2006 meeting between Thomas, Fraiberg, and Plaintiff regarding McCreary, on whose behalf Plaintiff opposed sex discrimination, on the day of her exit interview. Reading the facts in the light most favorable to Plaintiff, Fraiberg attempted to shift blame to Plaintiff for McCreary's resignation, when the reason stated to Plaintiff and in McCreay's exit interview, was that her departure was related to Fraiberg's conduct; and

(2) The temporal proximity of three months between the October 2006 meeting regarding McCreary's departure (and implicitly her accusations) and the January change to Plaintiff's wages/benefits.

Although Guardian's briefs do not clearly articulate a legitimate non-discriminatory reason for its change to Plaintiff's wages/benefits, at oral argument, Guardian articulated that its legitimate non-discriminatory reason was Plaintiff's job performance.

The Court notes that because Guardian shifted course to abandon its conviction related justification, Plaintiff is put at a significant disadvantage to respond to a new justification presented at oral argument. In any event, Guardian's citation to Plaintiff's performance related shortcomings do not give specific dates on which the majority of this behavior began. Def.'s Mot. at 9 (citing Ex. H at 25, 31-35). As a result, it is difficult to determine the temporal relationships between Plaintiff's alleged performance shortcomings, protected activities, and the alleged adverse actions.

Although a closer question, in light of the three to four month time span between the confrontational meeting discussing the departure of the employee on whose behalf Plaintiff opposed discrimination and the alleged adverse actions, a reasonable jury could find in Plaintiff's favor.

**2.      Michigan Elliot Larsen Civil Rights Act**

**A.     The After Acquired Evidence Doctrine Does Not Apply or is a Contested Material Fact**

Guardian offers the same argument under the after-acquired evidence rule in relation to Plaintiff's ELCRA claim for retaliation. Michigan courts adopt and apply the *McKennon* standard. *Wright v. Charters*, 210 Mich. App. 105, 112, 532 N.W.2d 889 (Mich. Ct. App. 1995); *Grow v. W.A. Thomas Co.*, 236 Mich. App. 696, 711, 601 N.W.2d 426 (Mich. Ct. App. 1999); *Horn v. Dep't of Corr.*, 216 Mich. App. 58, 67, 548 N.W.2d 660 (Mich. Ct. App. 1996). As a result, for the same reasons it fails under Title VII, reliance on the after-acquired evidence to foreclose Plaintiff's claim fails here.

**B.     Burden Shifting Analysis & ELCRA Distinctions**

Guardian attacks the same elements of a prima facie case with respect to Plaintiff's claims under ELCRA. With the exception of two elements, the elements and shifting burdens of an ELCRA retaliation claim are the same as Title VII. *See Kuta v. GMC*, No. 05-72927, 2006 U.S. Dist. LEXIS 74909, at *9-10 (E.D. Mich. Oct. 16, 2006); (citing *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004)); *Helmi v. Solvay Pharms., Inc.*, No. 05-36, 2006 U.S. Dist. LEXIS 84562, at *40-41 (W.D. Mich. Nov. 21, 2006) (citing *Meyer v. City of Ctr. Line*, 242 Mich. App. 560, 569, 619 N.W.2d 182 (2000)).

The first distinction between the elements of ELCRA and Title VII is the level of connection required between the plaintiff's protected conduct and the adverse action. ELCRA requires that the protected activity be a "significant factor" in the employer's adverse employment action, not merely that there was a causal link between the two

25

events.  *Mickey*, 516 F.3d at 523.  This distinction applies equally to the opposition and participation clauses.  *Kuka*, 171 F.3d at 1080.

Despite this higher standard, based on the same evidence the Court found supported a "causal connection" and pretext under Title VII, the Court finds that a jury could reasonably find retaliation was a "significant factor" in Plaintiff's termination and the non-termination actions.

The second distinction between ELCRA and Title VII is the egregiousness of the conduct required to meet the third element of the prima facie case.  Unlike Title VII, which requires a materially adverse action, such that a reasonable employee might choose to surrender the protected activity and "quietly [accept] substandard conditions," at least before *Burlington*, ELCRA (in line with previous federal precedent) required a materially adverse *employment action,* so egregious, that it changed the terms and conditions of employment.  Unpublished decisions by the Michigan Court of Appeals have assumed without discussion that ELCRA's requirement of a materially adverse *employment* action survived *Burlington*'s change to federal law.  *See e.g. Pender v. Olivet College Bd. of Trs*., No. 273723, 2008 Mich. App. LEXIS 152, at *16-17 (Mich. Ct. App. Jan. 22, 2008) (unpublished).  However, Guardian does not challenge the satisfaction of this element, and therefore, this distinction is not a ground to reach a result different than that reached under Title VII.

Plaintiff's retaliation claim under ELCRA's opposition and participation clauses will continue to trial.

**3.      Michigan Sales Representative Commissions Act**

The statute provides:

All commissions that are due at the time of termination of a contract between a sales representative and principal *shall be paid within 45 days after the date of termination.* Commissions that become due after the termination date *shall be paid within 45 days after the date on which the commission became due.*

M.C.L. § 600.2961(4) (emphasis added).

The statute defines "sales representative" as:

[A] person who contracts with or is employed by a principal for the solicitation of orders or sale of goods and is paid, in whole or in part, by commission. Sales representative does not include a person who places an order or sale for a product on his or her own account for resale by that sales representative.

M.C.L. § 600.2961(1)(e). "Principal" is defined as a person or entity that either:

(1) Manufactures, produces, imports, sells, or distributes a product in [Michigan]; or

(2) Contracts with a sales representative to solicit orders for or sell a product in [Michigan].

M.C.L. § 600.2961(1)(d).

The statute defines "commission" as:

[C]ompensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the amount of orders or sales or as a percentage of the dollar amount of profits.

M.C.L. § 600.2961(1)(a).

The statute specifies that "[t]he terms of the contract between the principal and sales representative shall determine when a commission becomes due." M.C.L. § 600.2961(3).

Plaintiff had an employment contract for "the solicitation" and "sale" of a limited

27

amount of equipment, as well as the solicitation and sale of home alarm services, and

was "paid . . . in part, by commission."  M.C.L. § 600.2961(1)(e).  The sale of equipment

fits within the definition of the sale of a "good," and Guardian concedes that it contracted

with Plaintiff for solicitation of a small amount of equipment (although some equipment

was leased).  *See Klapp v. United Ins. Group Agency, Inc.*, 259 Mich. App. 467, 471,

674 N.W.2d 736 (Mich. Ct. App. 2003) ("'Goods' means all things (including specially

manufactured goods) which are movable at the time of identification to the contract for

sale other than the money in which the price is to be paid, investment securities (article

8) and things in action. . . .") (citing M.C.L. § 440.2105); Def.'s Mot. at 7.

In *Mahnick v. Bell Co.*, a case cited by neither party, the Michigan Court of

Appeals was faced with the question of whether a general contractor provided a

product, and could therefore be defined as a "principal" under the statute.  Although

noting the decision was not directly controlling, *Mahnick* cites *Frommert v. Bobson

Const. Co.*, 219 Mich. App. 735, 558 N.W.2d 239 (1996), in which the Michigan Court of

Appeals had to determine whether the repair of a roof resulted in the provision of a

"good" or "service" under the Uniform Commercial Code.  *Mahnick*, 256 Mich. App. at

163-164; M.C.L. §§ 440.2725, 600.5807(8).  The *Frommert* court reasoned:

> We conclude that the contract between the parties was predominately one
> for services, rather than one for a sale of goods . . . .   [D]efendant was to
> remove the old roof and replace it with a new . . . roofing system . . . .  In this
> case, it is difficult to conceive of the goods being supplied, the roofing
> material, *as the predominant purpose of the contract*.  That is, plaintiff
> needed to have a new roof installed, and the service of removing the old roof
> and replacing it with the new roofing system *was clearly the predominant
> purpose of the contract*.

*Mahnick*, 256 Mich. App. at 163-164 (quoting *Frommert*, 219 Mich. App. 735 (1996)).

Citing *Frommert, Mahnick* then reasoned:

> Similarly, as a general contractor, defendant *principally provides services to project owners. The fact that the end result of those services may be a product* such as a building or a building addition does not change the essential character of defendant's work as a service provider, or change the character of plaintiff's work to estimate jobs for defendant into a sale of a good. Thus, for the reasons discussed herein, we conclude that the trial court correctly granted defendant's motion for summary disposition of plaintiff's claims under the SRCA.

*Mahnick*, 256 Mich. App. at 164 (emphasis added). The implication derived from *Mahnick* is that the relevant question under the MSRCA is what type of work "predominates." This reading precludes Plaintiff's novel argument that if any *portion* of Guardian's business involves the sale of goods, regardless of how minute, the statute applies.

Plaintiff's circumstances are arguably distinguished from *Mahnick*. Unlike *Mahnick*, the end result of the provision of its "service" does not arguably result in a "good." Instead, at the beginning of the provision of its service, it offers an option to lease or sell equipment, which can improve the quality and effectiveness of the service it provides. A comparable example is the sale or rental of digital converters for cable service subscribers to allow access to high definition channels on analog televisions. Thus, general contractors provide one purchase option to customers: general contracting services. Guardian arguably provides two options: alarm services and the purchase (or lease) of related equipment. Indeed, Plaintiff's employment contract appears to separately calculate his commissions for the sale (and lease) of installation

equipment and the sale of security services. Pl.'s Ex. 12, 13.

Nonetheless, it is undeniable that the sale of the equipment is incidental to the service in which Guardian primarily specializes. The inquiry that appears relevant to the Court is whether a customer could engage with Guardian (including its commissioned employees), as a supplier of "goods," without also doing so as a provider of a "service." This approach reasonably extends the approach taken in *Mahnick* to the facts before the Court.

At oral argument, Plaintiff conceded that Guardian does not offer the purchase of equipment separate and apart from the provision of its security service, such that a customer could purchase "goods" without also purchasing services. Because Guardian's provision of a service "predominates," the Court holds the act does not apply to him, and his claim is without merit. *See Mahnick*, 256 Mich. App. at 164.

**4.      Breach of Contract**

Plaintiff alleges breach of contract on account of Guardian's failure to pay commissions as stated in the 2006 and 2007 employment contracts. The essential elements of a valid contract under Michigan law are:

(1) parties competent to contract;
(2) a proper subject matter;
(3) a legal consideration;
(4) mutuality of agreement; and
(5) mutuality of obligation.

*Detroit Trust Co. v. Struggles*, 289 Mich 595, 599, 286 N.W. 844 (1939); *Hess v. Cannon Twp.*, 265 Mich. App. 582, 592, 696 N.W.2d 742 (Mich. Ct. App. 2005);

*Thomas v. Leja*, 187 Mich. App. 418, 422, 468 N.W.2d 58 (Mich. Ct. App. 1991).

Generally, contracts which impose obligations prohibited by statute are void and unenforceable. *Mino v. Clio Sch. Dist.*, 255 Mich. App. 60, 71, 661 N.W.2d 586 (Mich. Ct. App. 2003). Guardian argues that because M.C.L. § 338.1051 et seq., prohibits Plaintiff from working as a security guard because of his conviction, his employment agreement is void and unenforceable. Plaintiff counters by noting a distinction made in the statute between persons "in the employ" of a private security company before and after March 28, 2001. According to Plaintiff, his employment was not in violation of the statute after 1989 when his conviction became five years old, because prior to March 28, 2001, a private security company could hire somebody with a criminal conviction if the conviction was five years old at the time they applied. Thus, Plaintiff maintains Guardian could have avoided violation of the statute by firing and immediately rehiring Plaintiff in 1989 (five years after his conviction), after which his employment would not have violated the statute. Plaintiff misreads the statute, and his argument is unavailing because Guardian employed him prior to March 28, 2001, and what it could have done is not important: the facts that govern is the situation as it was.

Under M.C.L. § 338.1068, which regulates private security companies, "[a] licensee shall not knowingly employ any person who fails to meet the requirements of section 17." Section 17, states "[e]mployees *in the employ* of a licensee after March 28, 2001 shall meet the [following] qualifications," M.C.L. § 338.1067(2) (emphasis added), listed in that section and Section 6:

(1) has not been *under any sentence, including parole, probation, or actual*

*incarceration, for the commission of a felony*;

(2) has not been convicted of an offense listed in section 10(1)(c) within 5 years before the date of application;

(3) has not been adjudged insane unless restored to sanity by court order;

(4) does not have any outstanding warrants for his or her arrest;

(5) be at least 18 years of age; and

(6) have had at least an eighth grade education or its equivalent.

M.C.L. §§ 338.1056(1)(c),(e), (j)-(k) (emphasis added), 338.1067(2).

The term "employ" is properly construed as constituting "employment," not, as Plaintiff suggests, the date employment began.  Plaintiff alleges breach of contract to pay commissions on his 2006 and 2007 contracts.  Pl.'s Resp. at 11.  During the time period covered by these contracts Plaintiff was prohibited by law from working for Guardian under any circumstances.

Guardian points to *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586 (Mich. Ct. App. 2003), and argues that because Plaintiff's employment was illegal, any agreement for his services was void and unenforceable.  *Mino* is distinguished.  M.C.L. § 338.1051 et seq., does not contain similar language making any employment agreement in violation of the statute void and unenforceable.  Nonetheless, an explicit statement to this effect is not required to void contracts that require violation of a statute.  *See Gilbert Charles Vanpoperin & Dev. Eng'g Co. v. Dilorenzo*, No. 265168, 2006 Mich. App. LEXIS 1767, at *5 (Mich. Ct. App. May 30, 2006) (unpublished) (citing *Kukla v Perry*, 361 Mich. 311, 324, 105 N.W.2d 176 (1960))  Indeed, where "an illegal contract is involved, the court will not enforce it or grant relief thereunder, particularly where it is not the innocent party that is pleading to the court." *Kukla*, 361 Mich. at 324-325.  Because Plaintiff is not an

innocent party, he may not enforce the contract.

Plaintiff argues the withholding of wages for work performed violates the Michigan Wages and Fringe Benefits Act, M.C.L §§ 408.473, 475. This argument is without merit. Plaintiff did not bring a claim under this statute, which is merely "an administrative remedy that is an alternative to court action at the election of the employee[]." *Stubl v. T.A. Sys.*, 984 F. Supp. 1075, 1092 (E.D. Mich. 1997); *Ayres v. Balousek*, No. 04-71802, 2005 U.S. Dist. LEXIS 17471, at *12-13 (E.D. Mich. Aug. 22, 2005).

In addition, Plaintiff's reliance on *Cabrera v. Ekema and Sanchez v. WCAC Eagle Alloy* is without merit. *Cabrera v. Ekema*, 265 Mich App. 402, 695 N.W.2d 78 (Mich. Ct. App. 2005); *Sanchez v. WCAC Eagle Alloy Inc.*, 254 Mich. App. 651, 658 N.W.2d 510 (Mich. Ct. App. 2003). *Cabrera* involves the appeal of a discovery order for plaintiff's social security numbers, primarily in relation to a claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. This suit does not make a claim under the FLSA, and thus, Michigan common law is more appropriate authority. *Cabrera* is further distinguished because it involved considerations relevant to federal immigration policy. *Sanchez*, is similarly distinguished because it involves claims under Michigan's workers' compensation regime. For similar reasons to those preserving Plaintiff's Title VII and ELCRA claims, the workers' compensation regime is a distinct no-fault regime supplanting tort law, and is distinguished from Michigan's common law of contracts. Moreover, Michigan's workers' compensation statute governing this no-fault system contained a broad definition of "employees" under the act.

By reference to *William's Delight Corp. v. Harris*, 87 Mich. App. 202, 273 N.W.2d 911 (Mich. Ct. App. 1978), Plaintiff appears to argue he should be able to enforce his employment contract under the doctrine of estoppel or *pari delicto*. The *pari delicto* argument is somewhat inapposite, as it is a defense, usually relevant to securities actions. *See id.* at 209-210; *Investors Equity Group v. Universal Symetrics Corp.*, 53 F.3d 159, 161-162 (6th Cir. 1995). In any event, the doctrine cannot support Plaintiff's claim because both parties knowingly continued the employment agreement, when aware of its illegality. *See William's Delight*, 87 Mich. App. at 210 ("[I]f both parties equally participated in the violation, this Court should grant relief to neither . . . .").

Plaintiff also argues Guardian should be estopped from non-enforcement of the contract. Generally, estoppel cannot be used to enforce an illegal contract or allow its rescission if the contract offends a public policy embodied in a statute. *Id.* at 208 (citing *Leland v. Ford*, 245 Mich 599; 223 NW 218 (1929)). The Restatement Second also provides guidance:

> A party to an illegal bargain can neither recover damages for breach thereof nor, by rescinding the bargain, recover the performance that he has rendered thereunder or its value, except as stated in §§ 599-609.

*Kukla v. Perry*, 361 Mich. 311, 323, 105 N.W.2d 176 (Mich. 1960) (quoting Restatement Second 598). Plaintiff does not establish he meets the requirements of an exception to this rule. *See id.*

Plaintiff argues that he is not trying to enforce an illegal contract because he merely requests payments for commissions earned, which was only a minor provision of the contract. This argument is without merit. These commissions were part of the consideration for the employment agreement, and therefore, "the whole consideration is

34

void, because public policy will not permit a party to enforce a promise which he has obtained by an illegal act or promise, although he may have connected with the act or promise another which is legal." *Id.* at 325. This result is reinforced by the fact that Plaintiff was not an innocent party to the illegal contract. *Id.*

Plaintiff's final argument is that because the statute is a "licensing statute," its violation only affects Guardian's status as a licensee. Plaintiff maintains that, as an employee, he could not violate the statute, and therefore, only Guardian's contractual rights should be prejudiced for violation of the statute.

Both parties overlook the fact that violation of the statute is a criminal misdemeanor:

> Except as otherwise provided in this act, *a licensee, manager, or employee* of a licensee who violates this act is guilty of a misdemeanor, punishable by imprisonment for not more than 90 days or by a fine of not more than $1,000.00, or both.

M.C.L. § 338.1082 (emphasis added); *see also* M.C.L. § 338.1077; *People v. Biller*, 239 Mich. App. 590, 593, 609 N.W.2d 199 (Mich. Ct. App. 2000); *Sterling Secret Service, Inc. v. Michigan Dep't of State Police*, 20 Mich. App. 502, 507, 174 N.W.2d 298 (Mich. Ct. App. 1969). Indeed, the statute's scope not only reaches violations by private security companies, but also individual employees and managers. Plaintiff's argument is without merit.

**5.    Promissory Estoppel**

The elements of promissory estoppel are:

(1) a promise;

(2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee;

35

(3) which in fact produced reliance or forbearance of that nature; and

(4) in circumstances such that the promise must be enforced if injustice is to be avoided.

*Marrero v. McDonnell Douglas Capital Corp.*, 200 Mich. App. 438, 442, 505 N.W.2d 275 (Mich. Ct. App. 1993). The doctrine is cautiously applied. *Ford v. Nationwide Mut. Ins. Co.*, No. 97-70257, 1998 U.S. Dist. LEXIS 21189, at *19 (E.D. Mich. Dec. 30, 1998) (citing *Barber v. SMH, Inc.*, 202 Mich. App. 366, 509 N.W.2d 791 (1993)). Courts should only apply the doctrine where the facts are unquestionable and the wrong to be prevented undoubted. *Id.*

Plaintiff's knowledge that his employment was in violation of the statute forecloses relief. *See Leland*, 245 Mich. at 609 ("The proposition is universal that no action arises, in equity or at law, from an illegal contract; no suit can be maintained for its specific performance, or to recover the property agreed to be sold or delivered, or the money agreed to be paid, or damages for its violation."); *William's Delight Corp.*, 87 Mich. App. at 208; *see also Jones v. City of Cortland Police Dep't*, 448 F.3d 369, 372 (6th Cir. 2006) (citing *City of Mt. Vernon v. State ex rel. Berry,* 71 Ohio St. 428, 73 N.E.515, 516 (Ohio 1905)) (holding promissory estoppel does not apply to illegal contracts under Ohio law). This claim is without merit.

## V.     CONCLUSION

The Court **GRANTS in part and DENIES in Part** Guardian's Motion. The Court **GRANTS** the Motion on the MSRCA, breach of contract, and promissory estoppel claims. The Court **DENIES** the Motion on Plaintiff's retaliation claims under the ELCRA and Title VII. Trial will proceed on these claims.

**IT IS ORDERED**.

                                            S/Victoria A. Roberts
                                            Victoria A. Roberts
                                            United States District Judge

Dated:  August 5, 2008

The undersigned certifies that a copy of this
document was served on the attorneys of
record by electronic means or U.S. Mail on
August 5, 2008.

s/Carol A. Pinegar
Deputy Clerk